**Louise LAMPHERE, On behalf of herself and all other similarly situated,**

v.

**BROWN UNIVERSITY In Providence In the State of Rhode Island and Providence Plantations, et al.**

**In the Matter of Ann W. SEIDMAN/Luce Chair.**

**Civ. A. No. 75–140.**

United States District Court, D. Rhode Island.

May 6, 1988.

---

Nancy Gertner, Claudia M. Worrell, Boston, Mass., for plaintiff.

Beverly E. Ledbetter, Gen. Counsel, Peter J. McGinn, Tillinghast, Collins & Graham, Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

The question is what prompted the tenured faculty of the Sociology Department of Brown University to vote (7–2) to reopen a search for a candidate to fill the Luce Chair at the University. The significance is that unless Brown University has proven by clear and convincing evidence that its explanation for its conduct is not a pretext masking sex discrimination then Plaintiff Ann Seidman is entitled to relief.

A broad outline of the factual setting may be stated as follows: Brown University determined to create the Henry R. Luce Professor of the Comparative Study of Development, established a Selection Committee for that purpose, the two preferred male candidates declined appointment and rather than supporting the appointment of the third candidate, the Plaintiff, after reporting earlier its support for her candidacy, the Sociology Department determined to reopen the search. This is but a thumbnail sketch of the obviously more complex process. For further enlightenment and explication reference should be made to the opinion of the Court of Appeals in this matter reported at 798 F.2d 532 and the opinion of this Court reported at 613 F.Supp. 971.

The standard of proof, extrapolated by the Court of Appeals from the language of the Consent Decree entered in this action is that:

The University must show that [its] action can be plausibly explained without reference to considerations of sex, and it must provide clear and convincing evidence that such an explanation is the correct one.

*Lamphere v. Brown Univ.*, 798 F.2d 532, 536 (1st Cir.1986). The Court of Appeals in its consideration of this cause has substantially reduced the effort required of this Court. It has left for determination only one issue, and that issue is whether the action taken at the March 16, 1979 meeting of the tenured members of the Sociology Department, to reopen the search process was genuine or pretextual. As stated in the opinion of the Court of Appeals:

... the court should decide whether Brown has articulated legitimate reasons for reopening the search, and has proved clearly and convincingly that those reasons are the true ones.

*Id.* at 543.

Much had transpired before March 16 meeting of the Sociology Department. Some of the precedent events have a direct bearing upon the action taken at the March 16 meeting. Among the significant events the most significant was the fact that the Selection Committee for the Luce Chair had not at any time voted to offer the chair unconditionally to Ann Seidman. The only vote that was taken of the Selection Committee was a vote to extend an offer of the chair to her for a term of years. Later it was determined that this was not an acceptable condition. Another significant factor was that the University required a formal vote of the department in order to grant tenure which was a condition of the chair.

The Selection Committee, consisting of four members, in December of 1978 had voted to recommend two candidates unconditionally and a third ranked candidate Ann Seidman for a three to five year term. The vote for Ann Seidman was 3 to 1, with Dr. Rueschemeyer opposed. Dr. Rueschemeyer, Chair of the Selection Committee, opposed the appointment but his opposition was based upon the term limitation, a limi-

tation which all of the other Selection Committee members supported. It was later discovered that the appointment could not be for a term. There was talk of another Selection Committee meeting but no actual meeting took place.

On January 22, 1979, there was a meeting of the tenured members of the University's Sociology Department. Dr. Goldstein, a member of the department and a member of the Selection Committee, was out of the country. A memorandum was sent from Dr. Rueschemeyer and Alden Speare, Jr., the Chair of the Sociology Department to the Provost which recommended as a result of that meeting that Ann Seidman be appointed unconditionally if the second ranked candidate declined. This memorandum stated that this action had the support of the Selection Committee. It also represented that the Selection Committee had concluded that the pool of applicants would be "essentially the same" if the requirement for a joint appointment in the Sociology and Economics Departments were changed to appointment in the Sociology Department alone. Both of the representations were unfounded. When this discrepancy was discovered by the then acting Chairman of the Selection Committee, Professor Marsh, he and Dr. Goldstein sent a memorandum to the department chairman, Professor Speare stating their understanding that any appointment of Ann Seidman was to be a term appointment and that they did not agree at any meeting to "offer her a full appointment." This memorandum followed a March 15 meeting attended by Professors Speare, Marsh and Goldstein with Provost Glicksman. At that meeting, in response to a question by Provost Glicksman, it was made known that there was no formal vote of the Sociology Department at the January 22, 1979 meeting with respect to recommending anyone for the Luce Chair. The participants were instructed by Provost Glicksman that another meeting would have to be held by the Sociology Department and a formal vote taken since the appointment was a tenured position. The meeting with the Provost was prompted by a concern as to how the next step in the

process would take place with a divided sociology department whose recommendation would be presented to The Committee on Faculty Reappointment and Tenure (CONFRAT), the next step in the University appointment process. This concern was a legitimate concern since those who ordinarily would have presented the candidates were opposed to her nomination. Provost Glicksman sent the matter back to the department for a formal vote. The Court of Appeals has determined that there is no record support for a determination that Glicksman's decision was motivated by sex discrimination. *Id.* at 542.

Doctor Rueschemeyer's explanation of the statement in the memorandum that Ann Seidman's appointment had the support of the Selection Committee is that a meeting of the Selection Committee took place on the morning of January 22, 1979 in Professor Marsh's office attended by Professor Marsh, Professor Evans whom he "had asked to act as an alternate" and himself for the purpose of persuading Professor Marsh to his point of view and that he left with an assurance that Professor Marsh would accept the decision of the Sociology Department. Then the meeting of the Sociology Department took place at which no vote was taken and at which the department was told by Doctor Rueschemeyer that the Selection Committee's vote concerning Ann Seidman was not legal because he had learned the previous week that a term appointment was not possible for appointment to a tenured chair. He testified that he indicated to the meeting of the Sociology Department that the Selection Committee was prepared to accept the decision of the Sociology Department. After the meeting of the Sociology Department was concluded, he and Professor Evans met with Professor Hanson and advised him of the department's action. Hanson, who is an economist stated: "... well that's fine with me, since it is not an appointment in economics, I am advising you guys (sic) on what kind of economist to get, and I am ... that's fine with me, if that's your decision." It was on this basis that Doctor Rueschemeyer felt authorized to

state that the appointment of Ann Seidman to the Luce Chair had the support of the Selection Committee. Of course, at the same time Professor Goldstein was in Thailand and did not participate in the action. Doctor Rueschemeyer thus successfully, for the time being, orchestrated a reversal of the earlier December 16 vote of the Selection Committee in which he represented a minority of one to a majority position. It was when his manipulation of the committee was discovered that the department later took its questioned position.

The "consensus" arrived at the meeting of the Sociology Department on January 22, 1979 was actually a lack of objection according to Doctor Rueschemeyer. Rueschemeyer testified that he told others that he did not think that there was sex discrimination involved in the March action of the Sociology Department.

In summary, Brown University now argues that (1) the Search Committee on December 18, 1978 was 3 to 1 against a "full appointment" for Professor Seidman; (2) that the January 22, 1979 "consensus" of the Sociology Department was a result of either confusion concerning whether the issue was tenure or appointment for Professor Seidman or deliberate misrepresentation of the Selection Committee's recommendation; (3) that the 7 to 2 vote to reopen the search by the Sociology Department on March 15, was the result of an accurate statement of the Selection Committee's action and a recognition of the significance of the appointment to the educational image of the institution.

Basically, Professor Seidman argues that "several of the important reasons Brown offers for its decision are discriminatory as a matter of law," and that Brown has been "totally inconsistent in its recitation of reasons, that rather than demonstrating its 'true reasons' the record suggests pretext." Professor Seidman's subsidiary arguments are that a "requirement" of prior tenure imposed upon a female is "discriminatory as a matter of law" and the suggestion that a reopened search would attract new candidates violates the Consent Decree, that the "criteria" of unsolicited letters of recommendation is "at once incomprehensible and illegitimate." Plaintiff contends that the determinations that she would not provide a bridge between Sociology and Economics; that her methodology overlapped that of some Brown sociologists; that she lacked the desired level of recognition; that she was an excellent teacher but lacked scholarship; that she lacked administrative skills; that she had not published in refereed journals and that there were doubts about her ability with respect to fund raising are all pretext for the real reason, that she is a female, and, unacceptable to the male dominated Sociology Department for appointment to a prestigious University Chair.

There are some facts which are beyond dispute. First and foremost is that Brown University is nationally and internationally perceived as an institution determined to achieve educational excellence, a perception which has considerable factual basis. It has a reputation as a leading institution for the exposition of the liberal arts, a reputation which is undoubtedly prized by its most diligent faculty. The Luce Chair was created as a visible beacon of this effort to excellence. It was appropriately perceived as demanding not simply those who are good at what they do but demanding the very best available person, and it was not only necessary to obtain the services of the very best available person but also that the person selected be recognized in the academic community as the very best available.

With this background in mind, it is next necessary to consider what are the appropriate standards for selecting the candidate. Quite clearly, the decision may not properly be based upon the sex of the applicant. And, equally as clearly, the reasons given for rejection cannot be feigned, masking a decision actually based on sex. If the determination of this issue was based simply upon the circumstance that when it became apparent that the only candidate was a female, the search was called off, it would be easy to conclude that the sex of the applicant was the determining factor.

Some consideration must be given to the qualifications of those charged with making this significant decision.

The nature of the decision is also a consideration. There is no mathematical formula or test to be applied. The decision of each member of the Sociology Department must be made subjectively, based upon objective circumstances.

There is no transcript or record of what transpired at the March 16, 1979 meeting of the Sociology Department. The only document in evidence which remotely reflects a recorded record of that meeting is a memorandum from Allen Speare, Jr., Chair of the Department of Sociology to Provost Glicksman dated March 23, 1979. The purpose of the memorandum was to describe the "major reasons" why the tenured faculty of the Sociology Department voted on March 16 to reopen the search rather than recommend a tenured appointment of Ann Seidman. The memorandum stated five numbered "major reasons." Before doing so, however, Professor Speare stated:

> It is important to point out that there never was unanimous support for Ann Seidman's nomination to the Luce Professorship. The Search Committee had unanimously recommended Bardhan and Streeten as the first and second ranked candidates and the tenured faculty had approved these nominations without any opposition being expressed. However, in the case of Ann Seidman, the Search Committee was divided and had presented a compromise recommendation that she be offered a three-year term appointment in the event that Bardhan and Streeten both declined the professorship.

> Between the time when the Search Committee made its recommendation and the January 22 meeting of the tenured faculty, Professor Rueschemeyer consulted you and learned that the Luce professorship could not be offered as a three-year term appointment. It was not possible to hold another meeting of the Search Committee at that time because Professors Goldstein and Hanson were out of the country. Professor Ruesche-

meyer asked for a meeting of the tenured faculty anyway because he was going to England for a semester's leave at the end of the week.

> At the January 22 meeting the tenured faculty discussed this problem and decided to recommend Ann Seidman as the third candidate. This decision was based on a consensus of those present at that time, although no vote was taken. The fact that some reservations were expressed by those present implied support was not unanimous at that time. More importantly, two influential members of the tenured faculty, Sidney Goldstein and Robert Marsh, were not present at the time the consensus was reached. Professor Goldstein was in Thailand and Professor Marsh had had to leave the meeting to attend a class before the final decision was made. At the March 16 meeting Professors Goldstein and Marsh both spoke in opposition to nominating Ann Seidman for a permanent appointment to the Luce Professorship.

Speare's memorandum made it clear that not all members of the Sociology Department were in agreement with all of the major reasons, as he called them, for not offering the appointment to Ann Seidman on a permanent basis. He presented the views variously as those of "several", "some" and "most" of the faculty members. Several of the faculty felt that Ms. Seidman did not provide the bridge between the disciplines of sociology and economics that had been the initial objective of the appointment. This reason was based upon the undisputed fact that Ann Seidman was not an acceptable appointment from the point of view of the economics department. The representative of the economics department had indicated to the Search Committee that he had no objection if the appointment was in the department of sociology, but failed to give her appointment the endorsement of the economics department. One of the members of the Sociology Department, Dr. Rueschemeyer, in response to this circumstance testified that this was to be an "intellectual" rather than a "departmental" bridge.

Some members of the sociology department were reported to have felt that Ann Seidman did not possess the type of methodology required which they viewed as a methodology different from that used by some Brown sociologists, and that the appointment would not make a distinctive contribution in terms of methodology.

The third major reason discussed by Professor Speare was that the appointment did not provide the desired level of recognition for the University in the area of Development Studies. It was observed that several unsolicited letters were received supporting the candidacy of the two higher ranked male candidates emphasizing their scholarship whereas "most of those writing in support of Seidman emphasized her teaching ability, her success in organizing conferences and her knowledge of African Development."

A fourth reason advanced was Ms. Seidman's lack of tenure at a major university.

The fifth reason cited was a consensus that a reopened search would attract several new candidates because the pool of those interested was constantly changing.

Ms. Seidman has sought to meet with argument each of the five major reasons advanced in Professor Speare's memorandum. Three of the reasons, which Ms. Seidman now describes, albeit inaccurately, as "criteria," she disputes as either discriminatory on their face or illegitimate. What is overlooked entirely in the argument is that Professor Speare sought only to describe some of the major reasons which some of the members of the Sociology Department considered in voting to reopen the search. Indeed, the actual vote was 7 to 2. There is no evidence as to why the two dissident votes were cast as they were.

It is argued that since many more males than females taught in economics departments granting Ph.D. degrees (831 to 14) nationwide there is an automatic discriminatory impact upon females if tenure is required for the appointment. However, tenure at Brown was itself a requirement for the appointment.

Of course, this argument misses the point entirely for it is clear that prior ten-ure was not a requirement for the appointment. A candidate who had been granted tenure would be considered better qualified for this distinguished appointment than one who had not achieved the distinction. This was clear from the testimony of those who testified. The reason advanced by some was a lack of tenure at a major university. Since tenure is granted not only on the basis of teaching ability but also because of scholarly achievements and publication in recognized journals, it is some indication of the qualification of the applicant. The concern of lack of tenure at a major university is stronger evidence still of a candidate's qualifications. While it is true that many more males than females had achieved tenure, the mathematical probabilities have no relevance when the appointment is to a single highly specialized and distinguished position. This argument is, thus, something of an overreaction to the circumstance.

It is vigorously asserted that the use of unsolicited letters and the hope of attracting new candidates are each illegitimate in their purpose. It is argued that if the search turns up a woman candidate "who meets the department's minimum standards then she must receive the appointment." It is argued that the "criterion" concerning unsolicited letters makes "no sense" since unsolicited letters might merely be evidence of a colleagues intrigue to get rid of a candidate. Indeed it is true that neither of these reasons would be considered to be mighty impediments to a favorable vote by a member of the Sociology Department. There was evidence that no unsolicited letters were received concerning one of the other candidates. The question really is, however, whether they are legitimate reasons and whether they have been clearly and convincingly proved as the true reasons.

Up to this point only the five major reasons cited by Professor Speare have been discussed because the Plaintiff has postured the argument in the form of meeting the allegations of an indictment, arguing that there is no sensible or evidentiary basis for the Department's conclusion. At

the same time she argues that it is not the individual views of the members of the Department that is significant, rather it is the collective determination of the Department which counts. The Plaintiff would have this Court ignore the initial paragraphs of Professor Speare's memorandum. A fair construction of the memorandum is that Professor Speare points out first that Professor Seidman had not at any time been recommended for appointment to the Luce Chair by the Selection Committee. Although the argument is made that the reopening of the search was a reversal of the Department's prior action, this is distinctly not so. The only action that had been previously taken was a so-called consensus based on an incorrect understanding that the Selection Committee had nominated Ann Seidman for the chair on a permanent basis. The major reasons that were cited were not major reasons for reopening the search, but were major reasons why in the judgment of her peers, Ann Seidman was not qualified for the appointment to the Luce Chair. It was not a circumstance in which having received the knowing approval of the Department, the approval was then later denied to her.

Professor Speare's memorandum is not the only evidence of what transpired at the meeting of the Sociology Department.

Professor Barbara Ann Anderson was an Associate Professor of Sociology at the time of the March 16, 1979 meeting of the Sociology Department. At the time of trial she was a full Professor of Sociology at the University of Michigan. She had also attended the January 22, 1979 meeting of the Sociology Department. At that meeting she testified Dr. Rueschemeyer had given the impression that the Selection Committee had recommended Ann Seidman for the Luce Chair, if another candidate did not accept. She had learned between the January and March meetings of the Department that the appointment was an appointment to the tenured faculty in which the faculty was supposed to "exercise their full professional judgment." Until that time her impression had been that the issue was whether the Department would accept the unanimous recommendation of the Selec-

tion Committee. It was at the March meeting that she learned that the Selection Committee had actually voted 3 to 1 against offering a permanent position to Professor Seidman. She testified that she voted to reopen the search because "the Search Committee was not in favor of making the offer to Ann Seidman." She also testified that Professor Seidman's letters of recommendation failed to discuss the scholarly level of her research and that her publications were not in highly "regarded sources." She specifically testified:

"... Although it seemed clear to me that there had been no sex discrimination in this situation, it also seemed clear to me that if I hadn't known in detail—if I had only heard the general outline of what had happened—that I would have thought it was very likely that there had been sex discrimination, and I'm against sex discrimination and wouldn't want it in my department, and I would have been very upset if I thought that Ann had been a victim of sex discrimination."

Professor Anderson's testimony was most impressive evidence of Brown's lack of discriminatory purpose. Professor Dietrich Rueschemeyer was the Chairman of the Search Committee. He voted against giving Ann Seidman a term appointment to the Luce Chair because he thought that she should be offered the Chair unconditionally. Later it was he who reported the results of the January 16, 1979 meeting making Ann Seidman the next alternate candidate for appointment and stated that her appointment had the support of the Search Committee. Later, after he had left Brown University to go to Europe, it was determined that his report overstated the committee's support for Ann Seidman. He testified that although he had concerns because of the Department's attitude toward women and that when he had become chairman women were discriminated against based on salaries paid that he did not think that sex discrimination was involved in the decision to reopen the search.

The vote of the Department had been seven to two. It is reasonable to assume that Professor Evans was one of the two

"no" votes. He testified that the memorandum prepared by Professor Speare was replete with shortcomings; that it did not accurately report the travel of the various candidacies before the Selection Committee and that there was no basis to support any of the five reasons itemized by Professor Speare as reasons why the Department voted to reopen the search. His response to the question whether he believed the decision to reopen the search was motivated by sexually discriminatory motions was illuminating. He stated:

Q  Did you believe that the decision to reopen the search, the decision of the sociology department on March 16, 1979, to reopen the search, was a decision based on sex discrimination?

A  I am afraid that sex discrimination entered into that decision in at least two, and possibly three ways. First, and as I had pointed out in my testimony to the monitoring committee there is the question of the image of the candidate, that is to say, it is clearly the case that when one thinks of the image of a tenured professor in economics, one thinks of an aging male. Therefore, when people begin to make decisions, based on image and visibility, sex consciously or unconsciously, becomes a focus, and therefore insofar as the decision on March 16th, strayed increasingly away from the ability of the candidate to teach, strayed increasingly away from the quality of her research, the quality of her written work, sex entered increasingly into that decision, inevitably.

Second, by holding the meeting on March 16th at all, it was clearly the case that Ann Seidman was being subjected to a procedure that was different from, and more stringent than, any of the male candidates in the search had been subjected to. Third, and this is obviously a more difficult kind of evaluation to make, but third, I have a hard time excluding the possibility of sexual discrimination of sexual discrimination in the following sense, and that is in the discussion of Dietrich and myself, with Bob Marsh on the morning of January 22nd, Bob talked to us for 2½ hours, and never said to us,

I cannot and will not vote for or support Ann Seidman for this position. Now, we have been colleagues for ten years, if Bob had a reason that he felt was legitimate for saying that, I can't understand why he didn't do so. Likewise, he never made that statement in the department meeting. If he had a reason, having to do with scholarship, with the person's qualifications, why didn't he not say that. Given that, I can't help but ask myself, is there some other reason. If so, is it not possible that this has to do with attitudes toward women, with the sex of the candidate, et cetera. Now, that's a very uncomfortable feeling for me to have, but I really have no adequate rational explanation for his failure to say first of all to Dietrich and myself, on the morning of March 22nd, I will not support this candidate, I do not feel she's qualified, I feel it would be bad for the center to hire her.

The very best that can be said for this response is that it is based on an assumption of simplemindedness on the part of those who voted to reopen the search if the choice was made on the basis that the public perceives a tenured professor of economics to be "an aging male"; that there is no evidence to suggest that Ann Seidman was being subjected to procedure different or any more stringent than that for the other candidates, i.e. support of the Selection Committee and the fact that his friend Professor Marsh chose to keep his reasons to himself can hardly be translated to mean that one may have an uncomfortable feeling that perhaps Professor Marsh was opposed to the appointment of a female because she was a female.

The fact of the matter is that Professor Marsh had long before made known his opposition to the appointment of Ann Seidman and this fact was indeed no surprise to Professor Evans.

There is one further aspect of the evidence which must be considered and that is the deliberations of the Affirmative Action Minority Committee, in which it concluded, ambivalently, that although Ann Seidman had been discriminated against because of

her sex she should be offered the Luce Chair or a University Chair.

The Affirmative Action Committee and the Sociology Department both suffered from the same misapprehension, that the Selection Committee had supported the appointment of Ann Seidman to the Luce Chair. The January 23, 1980 decision of the Affirmative Action Committee concluded that Brown University had violated the Exhibit E to the Consent Decree because it considered as criterion the fact that Ann Seidman had no previous tenure at a major university; her methodology was not sufficiently different from other scholars and she did not provide a "bridge" to economics, matters outside the scope of the written hiring plan provided in Exhibit E. The Court of Appeals has put this issue to rest. It has been interred. *Id.* at 539–40.

It is simply inaccurate to describe the Affirmative Action Committee as an unbiased faculty group concerned with an effort to avoid sex discrimination at Brown University. Quite clearly, it is not so. Two of the five members are appointed by the litigants in this action and the third member required their concurrence. This is hardly the usual unbiased faculty committee. This comment is not to suggest that the committee should be ignored, but is intended to suggest that its determinations should not be viewed as the dispassionate views of unbiased faculty observers.

The Affirmative Action Committee simply ignored the fact that the Search Committee did not recommend Ann Seidman for the Luce Chair. Its opinion of January 23, 1980 cloaks this deficiency in terms of idle ceremony. But this consideration, was an essential concern of the Sociology Department. The Committee has managed to stand the process on its head—dismissing the lack of Selection Committee approval as a formality and finding a violation of the Consent Decree by viewing the reasons cited by Professor Speare (of some, many— of the department members) as illicit criteria applied by the Department of Sociology. The Court of Appeals held that this was too high a standard, the "deviation" was over-

stated, and concludes that there was no violation of the requirement of a Personnel Vacancy Authorization (PVA). *Id.* at 539– 40.

The conclusion is inescapable that the 7–2 vote of the Sociology Department reopening the search was prompted by a real concern for the legitimate interests of Brown University. The explanation of its reasons for the vote is clearly the only sensible explanation. There was then no candidate who then had the support of the Selection Committee. The Department made a sincere and earnest effort to make a decision based upon what was in the best interest of Brown University. The essential uncontroverted reason was the failure of Ann Seidman to obtain the approval of the Selection Committee. The subsidiary basis is that Ann Seidman in spite of her very impressive credentials, does not meet the unique requirements of a prestigious chair at an eminent university either in terms of accomplishment or peer recognition. Brown University carried its burden convincingly by more than a preponderance of the evidence. The reasons asserted were the true reasons and were not pretext. There is no evidence to the contrary. A realistic appraisal of the circumstances demands the conclusion that the Sociology Department had no motive other than that of the maintenance of the highest order of excellence in their University. Brown has proven by clear and convincing evidence that its explanation is the true reason and not a pretext masking sex discrimination, and therefore, Plaintiff Ann Seidman is not entitled to relief and her complaint is dismissed.

SO ORDERED.