## MASSACHUSETTS ASSOCIATION FOR RETARDED CITIZENS, INC., et al., Plaintiffs-Appellees,

### v.

### Edward J. KING, et al., Defendants-Appellants.

### Nos. 81–1292, 81–1692.

United States Court of Appeals, First Circuit.

Argued Sept. 18, 1981.

Decided Dec. 18, 1981.

Bruce Mohl, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Thomas Miller, Asst. Atty. Gen., Boston, Mass., were on brief, for defendants-appellants.

Nonnie S. Burnes, Boston, Mass., with whom Richard W. Renehan, and Hill & Barlow, Boston, Mass., were on brief, for plaintiffs-appellees.

Before BOWNES and BREYER, Circuit Judges, and MURRAY,[*] Senior District Judge.

BOWNES, Circuit Judge.

This case is a late offshoot of five consolidated class actions that challenged on constitutional and statutory grounds the conditions at five schools for the retarded in Massachusetts. The basic actions were settled by consent decrees, but subject to the continuing supervision of the district court. The preliminary injunction that is the focus of this case was precipitated by the passage by the Massachusetts Legislature of a charge-for-care statute, St.1980, c. 329, §§ 44–51, that was intended to increase federal Medicaid reimbursement for services provided to residents at the state schools. The statute accomplishes this by requiring that state school residents who are ineligible for Medicaid because of the amount of their assets become eligible by reducing their assets or putting them beyond their control or paying for their own care. Hitherto, most of plaintiffs, regardless of the amount of their assets, were not charged for care. Because the Commonwealth would receive directly from Medicaid an increase in revenue of approximately 18% for fiscal 1981 and 31% for fiscal 1982, its interest in implementing the charge-for-care statute is obvious.

The district court, on plaintiffs' petition, issued a preliminary injunction prohibiting

[*] Of the District of Massachusetts, sitting by designation.

defendants from implementing the charge-for-care statute pending a final resolution of plaintiffs' claims on the merits. Defendants have appealed.

The underlying issue is whether the consent decrees entered in these cases prior to the enactment of the charge-for-care statute overrides the statute and requires defendants to provide care without charge to plaintiffs regardless of the amount of their assets.[1]

A short history of the entire litigation and the charge-of-care statute is necessary for an understanding of the case before us. We borrow heavily from the district court's unpublished opinion in reciting the factual background.

## HISTORY OF THE LITIGATION

The first of this five actions was filed in 1972 on behalf of the mentally retarded clients ** at the Belchertown State school. A similar suit was brought two years later on behalf of clients at the Walter E. Fernald State School. In 1975, plaintiffs filed separate class action suits on behalf of clients at the Monson Development Center, the Wrentham State School and the Paul A. Dever School. Defendants in each of these suits are officials of the Commonwealth of Massachusetts responsible for the operation of the institutions for the retarded.[2] The five cases were consolidated by order of the district court.

The complaints alleged that conditions at the institutions were constitutionally and statutorily inadequate. The cases were settled prior to trial because the Governor and the Attorney General of the Commonwealth "made a judgment that the level of care did not reach [a] constitutional level of care," and, as a result, concluded that "the case would be indefensible." [3]

Rather than engage in protracted litigation, the parties agreed to devote their resources and energy to the task of examining each institution in order to identify deficiencies and design practical and effective remedial programs. After hundreds of hours of difficult negotiations, the parties agreed to consent decrees that embodied the parties' collective assessment of the needs of the clients at the five state schools and the appropriate means of meeting those needs. The consent decrees were approved and appropriately entered by the district court.

The parties also negotiated and agreed to a "Final Decree on Personnel at the Five State Schools for the Mentally Retarded" (Personnel Decree) under which defendants agreed to comply with the personnel standards for care and treatment set forth in Title XIX of the Social Security Act. The district court approved the Personnel Decree on August 2, 1978.

## THE CHARGE–FOR–CARE STATUTE

Between 1970 and 1980, the Department of Mental Health (DMH) was statutorily prohibited from charging for the residential care of a person in a mental retardation facility who had reached the age of majority and had been in the care of the DMH for at least five years. Mass.Gen.Laws Ann. ch. 123, § 37 (prior to amendment).[4] Virtu-

1. Plaintiffs also claim that the charge-for-care statute violates the due process clause of the fourteenth amendment, Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. §§ 6001–6081, Mass.St.1980, c. 329, § 46; Mass.Gen.Laws Ann. ch. 123, § 27(a). The district court made no findings and ruling on these claims.

** "Clients" is the term used to describe residents at the state schools.

2. Defendants include the Governor of Massachusetts; the Secretary of Human Services; the Secretary of Administration and Finance; the Commissioner of Mental Health; the Assistant Commissioner of Mental Health for Re-

tardation; and the superintendents at the five state schools.

3. The district court in its September 11, 1981 memorandum opinion noted that these comments were made by Attorney General Francis X. Bellotti; they appear in the transcript of the July 25, 1977 hearing at pp. 17–18.

4. As enacted in 1970, Mass.Gen.Laws Ann. ch. 123, § 37 provided that to qualify for the exemption from charges, clients had to be over twenty-one years of age. In 1973, the legislature changed this age requirement to eighteen. Mass.St.1973, c. 925, § 50.

ally every member of the plaintiff class meets these criteria.

Most clients at the state schools are categorically eligible to receive Medicaid benefits by reason of their mental retardation. There are, however, financial eligibility requirements that preclude federal Medicaid assistance for clients with assets in excess of the allowable maximum. In most cases, this amount is $1,500.[5] According to defendants, a significant number of clients at the state schools are currently ineligible for Medicaid benefits because they hold assets in excess of this amount.

Under the joint federal/state Medicaid program, the Commonwealth receives federal reimbursement for approximately one-half the cost of services provided by the state schools.[6] Federal funds have become an important source of revenue for the state schools. In fiscal year 1981, over 95% of the state schools' revenue (not including state appropriations) was derived from federal reimbursement for Medicaid expenses incurred by the 67% of the state school population then eligible for Medicaid.[7]

In early 1980, the Executive Office of Human Services (EOHS) began exploring ways to increase the Commonwealth's ability to obtain federal reimbursement for the cost of providing care to the mentally retarded clients at the state schools. As a means of achieving this goal, the EOHS participated in the drafting of the "charge-of-care statute," which was enacted into law as St.1980, c. 329, §§ 44–51 (see Appendix for text of statute). These sections amend portions of Mass.Gen.Laws Ann. chs. 123 and 118E that pertain to charges for care for persons in state institutions for the mentally retarded. The amendments impose full charges for care on all clients of state institutions for the mentally retarded who, because they hold assets in excess of the maximum amount allowable under federal law, are ineligible for federal benefits under Title XVI or Title XIX of the Social Security Act (Medicaid).

Defendants estimate that there are 1603 clients who are potentially subject to charges for care under the statute.[8] The charge to be levied at each institution is to be determined by the state Rate Setting Commission. The rate will reflect both operating and capital costs.[9] According to defendants, the full cost of a client's care in fiscal year 1981 was between $115.87 and $268.47 per day, or $41,134 to $95,307 per year.[10]

The Commonwealth does not expect to gain significant revenue from charges imposed directly on clients. Even if the DMH charged all clients potentially affected by the statute, the amount of revenue produced would be limited. The figures provided by defendants indicate that the average client potentially subject to charge would totally consume his assets in less than one month if he were charged for the full cost of his care.[11]

Under the statute, clients with assets in excess of $1,500 can become Medicaid eligible and avoid charges for care by "sheltering" their assets. This can be done by either setting up a joint bank account or by placing the assets in an irrevocable trust.

---

5. *See* Social Security Act, tits. XVI & XIX, 42 U.S.C. §§ 1382; 1396–1396i (1974).

6. Mass.Gen.Laws Ann. ch. 123, § 37 specifically provides that the prohibition against charges for care contained therein does not preclude the Commonwealth from obtaining federal reimbursement under the joint federal/state Medicaid program for services rendered to eligible clients at the state schools. The same is true with regard to other third-party payment systems. *Id.*

7. Affidavit of Mary V. Kurkijian, Director of the Revenue Office of the Executive Office of Human Services, at 2 [hereinafter cited as Kurkjian Affidavit]. During fiscal year 1981, Medicaid revenues covered 52.5% of the cost of operating the state schools for the retarded. *Id.*

8. Defendants' Report, May 12, 1981, at 1.

9. Kurkjian Affidavit, *supra* note 7, at 2.

10. Kurkjian Affidavit, *supra* note 7, at 2.

11. Kurkjian Affidavit, *supra* note 7, at 2–3.

The charge-for-care statute specifically provides for a "program of legal assistance to facilitate the establishment of trusts." St.1980, c. 329, § 50. This program became known as the Client Trust Fund Project (Project). The purpose of the Project was to help clients and their families select an appropriate method of alienating their assets in excess of $1,500 by providing them with legal and financial advice. The Project staff conducted informational meetings and provided the appropriate family member or guardian with an information guide which, in addition to explaining the objectives and mechanics of the Project, included a selection-of-option form that was to be completed and returned to the Project staff within seven days of receipt. The form contained three options: (1) establish an irrevocable trust; (2) create a joint, consignatory bank account; or (3) spend down any assets over the prescribed maximum level. The Project also offered clients a model trust instrument as an aid for drawing up an irrevocable trust.

Plaintiffs soon became dissatisfied with the operation of the Project. Of particular concern was the fact that approximately 900 of the mentally retarded clients potentially subject to charge do not have guardians or legal representatives to help them assess the various alternatives available to them.[12] About sixty of these clients have no family member, guardian, conservator, or any other general representative to assist them. Plaintiffs allege that the Project failed to give individualized attention to the financial needs of each of these clients, and that the information provided by the Project was inaccurate, incomplete and confusing.[13]

**THE PRELIMINARY INJUNCTION**

On December 15, 1980, plaintiffs filed a motion seeking an injunction prohibiting defendants from charging plaintiffs for their care, which plaintiffs alleged violated defendants' obligations under the consent decrees. Plaintiffs also requested that the district court enjoin defendants from transferring any of plaintiffs' assets to an irrevocable trust through the Project until defendants had demonstrated that they had given adequate attention to the individual needs of those who choose to place their assets in trust. On December 18, 1980, plaintiffs filed a motion for a temporary restraining order, requesting essentially the same relief.

The matter came before the district court for a hearing on January 12, 1981. At that time the court urged the parties to reach an agreement whereby legal counsel could be assigned to the group of unrepresented clients, and suggested that the Commonwealth could finance this arrangement as part of the court monitor component of the Project. The court advised the parties that such representation was necessary and that only after it was put into place would the court decide whether the statute conflicted with the terms of the consent decrees.

Despite these suggestions, the parties could not resolve their differences. Specifically, defendants remained unwilling to provide the type of legal representation and a current, individualized financial plan for each client that plaintiffs sought. Plaintiffs, therefore, filed another motion for a temporary restraining order on January 20, 1981, seeking to prohibit defendants from encouraging, processing, filing or seeking approval of any trusts for clients until each client had a current individual financial

---

**12.** Defendants' Report, May 12, 1981, at 1.

**13.** Arthur M. Connelly, President of Massachusetts Association for Retarded Citizens, Inc. (MARC), and William Crane, Project Director for Development Disabilities Law Center (DDLC), co-authored a letter dated October 6, 1980, addressed to Charles F. Mahoney, Secretary, Executive Office of Human Services, outlining in detail their concerns regarding the administration of the Project. The record also contains numerous affidavits of staff members at DDLC and members of clients' families who attended the group informational meetings conducted by the Project staff. These affidavits reflect the Project staff members' consistent failure to mention the possibility of "sheltering" clients' funds by leaving them in a dependent account with the school superintendent, as well as the confusion of clients' family members as to the exact nature and effect of the various options offered by the Project.

plan that could be reviewed by his representative prior to setting up a trust, and until each client had access to individual, independent legal advice, including advice on possible modifications of the model trust document. Additionally, plaintiffs sought to require defendants to give notice to the court and plaintiffs' counsel prior to charging any client for care.

Following another hearing, the district court issued a temporary restraining order on February 4, 1981, which enjoined defendants from imposing charges for care on any client until all members of the plaintiff class had been meaningfully represented before deciding whether to: (a) submit to the charges; (b) place their assets in trust; or (c) contest the propriety of the charges for care. Defendants were ordered to notify the court of steps taken to provide adequate representation to each client potentially subject to charge.

Although they failed to comply with the district court's order to report on their progress in providing adequate representation, defendants filed an objection to the form of the temporary restraining order, a motion to dissolve the order, a notice of appeal, and a motion to suspend the order pending appeal. After issuing a memorandum explaining various delays and the extension of the temporary restraining order, the district court denied defendants' motions.

On September 11, 1981, the district court issued a preliminary injunction. This injunction did not deal directly with the plaintiffs' claim that members of the class had received inadequate legal representation. Rather, the preliminary injunction dealt directly with the basic claim that the Massachusetts statute was unlawful. The injunction, resting upon a preliminary determination that the statute was likely to be found unlawful and therefore unenforceable, enjoined the defendants from charging members of the plaintiff class for the cost of their care pending a final resolution of plaintiff's claims. Defendants appeal from this preliminary injunction and it is this determination of likely unlawfulness of the charge-for-care statute that is now before us.

■ In granting plaintiff's motion for a preliminary injunction, the trial court properly considered whether plaintiffs satisfied the following four criteria:

(1) the threat of immediate irreparable harm; (2) the likelihood of success on the merits; (3) whether the public interest would be better served by issuing than by denying the injunction; and (4) the comparable hardship inflicted upon the parties.

See *Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency*, 649 F.2d 71, 74 (1st Cir. 1981). Our standard of review is set forth in *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir. 1981), quoting *Charles v. Carey*, 627 F.2d 772, 776 (7th Cir. 1980):

The decision to grant or deny a preliminary injunction is a matter for the discretion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion.

■ We first turn to the critical and difficult question, whether plaintiffs are likely to succeed on the merits of their claim that defendants' implementation of the charge-for-care statute is inconsistent with defendants' obligations under the consent decrees. At the outset, we note that consent decrees, at least when entered into by private parties, are often viewed as contracts, interpretation of which depends in part upon language, in part upon the circumstances surrounding their formation, and in part upon the basic purposes of the decree. *United States v. ITT Continental Baking Company*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975). We recognize that programmatic decrees in public law litigation may call for somewhat more flexible interpretation in light of the need to

achieve their basic purposes (the eradication of unconstitutional conditions) and the need to accommodate the differing competencies of different branches of government as well as the differing needs and interests of the parties, *see* A. Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv.L. Rev. 1281, 1294 (1976). These considerations, along with the traditional tools of language, circumstance, and purpose, are determinative in the case before us.

Each of the consent decrees negotiated and agreed to by the parties in this case "sets forth the defendants' obligations toward class members." [14] Although the exact provisions of the decrees vary, all of them require defendants to provide a suitable living environment, and care, treatment, training and education for each member of the plaintiff class in accordance with federal and state standards. [15]

The Fernald, Wrentham and Dever decrees specifically state how the obligations set forth therein are to be funded:

> The defendants will take all appropriate actions necessary to implement this Decree and will use their best efforts to insure the full and timely financing of this Decree, including submission of appropriate budget requests to the Massachusetts General Court.... *The defendants agree to make every effort necessary, in matters within their control, to make available appropriated funds for expenditure to meet the obligations of this Decree.*

Wrentham and Dever Decrees, para. 67; Fernald Decree, paras. 8 & 34 (emphasis added). Similarly, the Personnel Decree, which applies to all five state schools, provides that:

> The state defendants agree that they will make every reasonable effort to se-

cure enactment of such appropriations as may be necessary to fund the hiring of the positions listed in [the decree].

Personnel Decree, para. 4. [16]

The district court concluded that the plaintiffs were likely to succeed on the merits of their claim that the decrees rendered the charge-for-care statute unlawful for the following reasons. It believed that the quoted language in the decrees conflicted with the statute because, under the decrees, the defendants were required to seek funds from the legislature to meet their obligations to plaintiffs. The court pointed out that defendants had consistently sought the necessary money from the legislature since the decrees were signed in 1978. Moreover, state law at the time the decrees were signed did not allow the state to charge members of the plaintiff class for care. And, plaintiffs could not have been expected to pay the cost of implementing the decree for it was admitted that at the time they lacked the financial resources necessary "to pay for the full cost of improvements being made at the institution pursuant to the consent decree." [17]

We disagree with the district court for two sets of reasons. First, we do not believe that the language of the decree or its basic objective requires the invalidation of the new state statute. The decree's language does not *expressly* forbid charging plaintiffs for their care. It simply requires the defendants to seek funding from the legislature to fund the decree—and it is conceded the defendants have lived up to this obligation. Still less does it expressly forbid the round-about type of charge enacted in the charge-for-care statute—a charge which is designed not so much to impose a burden upon plaintiffs as to satis-

---

14. *E.g.*, Fernald, Wrentham and Dever Decrees, para. 4.

15. Wrentham and Dever Decrees, para. 1; Belchertown Decree at 1; Monson Decree, para. 1; Fernald Decree, para. 1; Personnel Decree, para. 2.

16. The Belchertown and Monson decrees do not contain any general language concerning

funding. Both decrees specifically provide, however, that the capital improvements outlined therein will be paid out of capital outlay appropriations from the legislature. Belchertown Decree at 1 & 7, Monson Decree, paras. 17–19.

17. Kurkjian Affidavit, *supra* note 7, at 3.

fy federal rules that will lead to increased federal funding.

More importantly, the basic objective of the consent decrees is the elimination of conditions at state facilities that were so poor as likely to be unconstitutional. The state statute at issue here would not seem to interfere with the achievement of this purpose. To the contrary, insofar as it leads to additional federal funding, it may facilitate the decrees' basic objective. At a minimum, its enforcement appears likely to provide additional federal funds, which, in turn, may make available additional state funds; and there are many state programs that could use this money. *See, e.g., Brewster v. Dukakis*, No. 81–1688 (1st Cir. Nov. 16, 1981) (order staying preliminary injunction pending appeal).

Second, we think that the ruling on the validity of the charge-for-care statute draws the district court perilously close to at least a skirmish, if not a outright battle, with the state legislature. To rule that the consent decrees override the charge-for-care statute forces a direct conflict between a state executive branch agreement (sanctioned by a federal court) and a statute enacted by the state legislative branch in the exercise of its most zealously guarded prerogative—appropriating money pursuant to its constitutionally delegated power to control the public fisc. It also engenders a conflict between a federal court and a state legislature over a matter which does *not* represent a legislative refusal to appropriate funds necessary to implement the court's decrees. To the contrary, the statute at issue here represents a legislative judgment about how the necessary funds might be found.

The law in this area is sparse, but there are two recent cases that have addressed the underlying problem. *New York State Ass'n for Retarded Children v. Carey*, 631 F.2d 162 (2d Cir. 1980), involved an appeal from orders adjudging the governor and comptroller in contempt if funding was not provided for a review panel to oversee the operation of a state institution for the mentally retarded. The panel was provided for in a consent judgment to which the governor was a party. As here, the consent judgment required the governor and the other defendants to take all steps necessary to obtain the financing from the legislature to implement the terms of the judgment. Despite the governor's request, the legislature specifically deleted the appropriation for the operation of the review panel. In reversing the district court, the Second Circuit noted:

> In the face of constitutional violations at a state institution, a federal court can order the state either to take the steps necessary to rectify the violations or to close the institution. Thus, a state cannot avoid the obligation of correcting the constitutional violations of its institutions simply by pleading fiscal inability. *Dimarzo v. Cahill*, 575 F.2d 16 (1st Cir. 1978); *Welsh v. Likins*, 550 F.2d 1122 (8th Cir. 1977); *Rhem, supra*. But that remedy leaves the question of the expenditure of state funds in the hands of citizens of the state, not in the hands of federal judges.

*Id.* at 165.

The confrontation between the federal court and the executive department of the state in *Welsch v. Likins*, 550 F.2d 1122 (8th Cir. 1977), arose as a result of the legislature's failure to appropriate sufficient funds so that defendants (Minnesota Commissioner of Public Welfare, et al.) could comply with the terms of a court decree relative to the operation of a hospital for the mentally retarded. The district court in effect enjoined the defendants from complying with a Minnesota constitutional provision and a Minnesota statute which prevented them from carrying out the terms of the decree. The Eighth Circuit was able to avoid a direct ruling by remanding the case for further consideration until after the legislature adjourned. The language of the opinion was obviously intended to persuade the legislature to make the necessary appropriation. The court was fully aware of the implications of the case.

Apart from any questions of judicial discretion, the controversy raises the more

fundamental question of whether the district court had the constitutional power to order administrative officers of the State to bypass legally imposed restrictions on expenditures by disregarding the state laws imposing those restrictions. Id. at 1131.

This case, fortunately, has not reached the conflict stage of either *Carey* or *Likins,* nor is there any reason why it has to if the decrees are interpreted flexibly in light of their basic objectives—the amelioration of unconstitutional conditions. Thus, we need not consider whether the district court's power to order appropriate relief is affected by the fact that there has been no litigated finding of constitutional violation or by the fact that, while the decree directly implicates the spending power of the state, the legislature itself (charged with determining the allocation of state funds) was not a party to the decree.

In this instance, where the language of the decree does not conflict with the statute at issue, where the statute does not appear directly to impede the basic objective of the decree, and where a contrary interpretation is likely to provoke a direct confrontation between a federal court and a state legislature exercising its fiscal powers, it seems unlikely plaintiffs would prevail on the merits of their claim that the state statute is unlawful. We are aware, of course, that plaintiffs have raised constitutional as well as federal and state statutory objections to the charge-for-care statute that have not yet been addressed by the district court. Our ruling on the question of probability of success on the merits is confined, as was that of the district court, to the supremacy of the consent decrees over the charge-of-care statute. For the reasons stated, we cannot find that plaintiffs will probably succeed on the merits. It is, therefore, unnecessary to consider the other criteria for a preliminary injunction.

*Remanded with instructions to dissolve the preliminary injunction.*

### Appendix

SECTION 44. Section 13 of said chapter 118E as amended by chapter 826 of the acts of 1971, is hereby further amended by adding the following sentence:—This section shall not apply to clients in a facility who, at the time of their application for medical assistance, are eligible for supplementary security income payments under the provisions of Title XVI of the United States Social Security Act on account of mental retardation, or who, being residents of a facility for the mentally retarded, are ineligible for benefits under this chapter on account of assets in excess of the limits provided in Title XIX of the United States Social Security Act.

SECTION 45. Paragraph (a) of section 27 of chapter 123 of the General Laws, as amended by section 55A of chapter 367 of the acts of 1978, is hereby further amended by adding the following three sentences:— The superintendent, subject to regulations of the department, may also petition the probate division of the trial court to appoint a conservator of the property of a mentally retarded person for purpose of transferring into trusts such portion of any dependent funds of a person deposited or otherwise held by the superintendent as may be necessary to establish the eligibility of such person for the medical assistance program under chapter one hundred and eighteen E or for supplemental security income payments under the provisions of Title XVI of the federal Social Security Act. The superintendent may establish such a trust on behalf of a mentally retarded person with independent funds only with the consent of such person. No such funds shall be transferred or held in trust except as is in the best interests of the clients.

SECTION 46. Section 37 of said chapter 123, as amended by section 50 of chapter 925 of the acts of 1973, is hereby further amended by adding the following sentence: —This section shall not apply to any client who is not eligible for benefits under Title XVI or Title XIX of the United States Social Security Act on account of assets in excess of the limits provided for therein; provided, however, that no charge shall be made to such person until the status of the

dependent and independent funds of such person has been reviewed by the department pursuant to section four of this chapter.

SECTION 47. Section 32 of said chapter 123, as most recently amended by section 4Q of chapter 1229 of the acts of 1973, is hereby further amended by adding the following sentence:—The department shall charge clients at a facility for the mentally retarded, but not the parent, child, spouse, guardian or conservator or other representative of the client, for the full cost of services rendered, as the cost shall be determined by the rate setting commission; provided, however, that no charges shall be assessed against dependent funds of any client deposited or otherwise held by the superintendent.

SECTION 48. Section forty-seven of this act shall take effect on January first, nineteen hundred and eighty-one.

SECTION 49. Upon passage of this act, the department of mental health will make reasonable efforts in a timely fashion, including written notice by registered mail, and notification to next of kin, to give notice of the provisions of sections forty-four through forty-eight, inclusive, of this act to any mentally retarded person with assets in excess of the amounts necessary to establish eligibility for benefits under Title XIX of the United States Social Security Act, and to the parent and guardian of each such mentally retarded person and to the conservator of the property of each such mentally retarded person. Notice shall also be sent to each fiduciary who is obliged to register with the department pursuant to paragraph (*d*) of section twenty-seven of chapter one hundred and twenty-three of the General Laws. Within sixty days after the sending of the written notice by registered mail which is required by this section, each conservator or guardian shall submit to the probate court and to the department of mental health an inventory of the assets of the mentally retarded person. A current inventory which has been filed by a fiduciary pursuant to paragraph (*e*) of said section twenty-seven, shall be deemed to comply with the above requirement. If the inventory is not filed, the probate court shall at the request of the department appoint a representative of the mentally retarded person to act as the guardian or conservator in accomplishing the purposes of sections forty-four to forty-eight inclusive, of this act.

SECTION 50. Subject to appropriation, and the approval of the secretary of human services, the department of mental health will establish a program of legal assistance to facilitate the establishment of trusts in accordance with the provisions of sections forty-four to forty-nine, inclusive, of this act.

SECTION 51. Notwithstanding any general or special law to the contrary, the secretary of human services shall establish a billing and collection of fees for services rendered by the department including but not limited to third party payments, in accordance with a schedule of fees for such services, established by said department.